IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GARY QUIGLEY,

                Plaintiff,

    v.

EAST BAY MANAGEMENT, INC., TED
KARKUS, and JOHN DOE 1,

                Defendants.

CIVIL ACTION
NO. 13-3998

## MEMORANDUM

**SCHMEHL, J.**                                                   **June 17, 2014**

Plaintiff brings several claims based on a transfer of stock from his possession to Defendants' in 1997, a transfer he alleges he neither authorized nor was aware of. The claims are time-barred, and no reasonable finder of fact could conclude Plaintiff demonstrated the requisite diligence to toll the statute of limitations, so the Court will dismiss the case with prejudice in its entirety.

Factual and Procedural Background

From the complaint and the other materials the Court may consider,[1] the basic facts of the case are as follows:

Plaintiff Gary Quigley was an employee and stockholder of The Quigley Corporation, a public company; he was also involved with other related entities and was

---

[1] Without converting a motion to dismiss to a motion for summary judgment, courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." 5B Wright and Miller, Fed. Prac. & Proc. § 1357 (3d ed. 2004). These acceptable materials include press releases and SEC filings. *See* Fed. R. Evid. 201(b)(2); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 (2d Cir. 2010); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875-77 (E.D. Tenn. 2005).

the brother of Guy Quigley, Chairman, President, and CEO of The Quigley Corporation through at least 2008. In 1995, Plaintiff bought a block of 36,496 Quigley Corporation shares, and it appears he owned other shares as well.[2]

On January 15, 1997, The Quigley Corporation declared a two-for-one stock split, meaning that shareholders were issued additional shares to double the amount they held as of that date. Accordingly, on January 21, 1997, the company issued to Plaintiff an additional 36,496 shares, bringing his balance in the account in question up to 72,992 shares, as reflected by stock certificate TQC671, attached as Exhibit B to Plaintiff's complaint. The stock split was noticed publicly in at least the following forms: a press release the company issued on January 2, 1997; a NASDAQ notice dated January 24, 1997, that solely addressed the stock split; and four SEC filings dated February 18, February 24, and August 14, 1997, and September 15, 1999.

Plaintiff was living in England at the time of the stock split, though whether at the United Kingdom address listed on the stock certificate is not certain. Plaintiff also notes that at the time, he was dealing with the death of his wife and his new role as a single parent, though the record does not establish the precise date of her death.

In any event, Plaintiff alleges he was not aware of the stock split or the resultant doubling of his shares. He alleges that on February 18, 1997, he directed the transfer of the original number of shares, 36,496, to a new account and, unaware of the doubling, believed no shares remained in the original account.

According to Plaintiff, it is at this point that Defendants enter the story. Defendant Ted Karkus may have been a shareholder of The Quigley Corporation at the time, and in

---

[2] *See* Complaint (Notice of Removal (Docket #1), Exhibit I) Exhibit D.

2009, took over the company through a proxy contest. Karkus may also have had an interest, perhaps even the sole interest, in Defendant East Bay Management.[3]

Plaintiff alleges that shortly after he removed what he thought were all the shares in the original account, Karkus somehow arranged to have the unknown remaining shares, allegedly valued at $17.50 per share, transferred to East Bay Management for his own benefit without Plaintiff's authorization or knowledge. To substantiate this transfer, Plaintiff attached to his complaint a record of a transfer to East Bay Management of what appears to be 151,496 shares under certificate TQC1348, with an apparent date of August 14, 1997 (all numbers on the document are somewhat difficult to decipher, but certainty on those points is unnecessary for the analysis below).[4] That date is several months after the stock split and Plaintiff's transfer of the 36,496 shares to a new account.

Plaintiff's complaint does not include allegations regarding when and how he later became aware of the stock split and allegedly fraudulent transfer, but his opposition brief indicates that when he attended Karkus's deposition in another case, he learned of the stock split and Karkus's involvement with East Bay Management, then investigated the history of his share holdings. The date of that deposition is uncertain in the record, but the parties appear to agree it was less than two years before Plaintiff filed the present suit. The parties have indeed engaged in other litigation, including: a related case currently also pending before the undersigned, *Estate of Josephine Quigley v. East Bay Management, Inc.*, 13-5547; three earlier cases in this Court, *The Quigley Corporation v.*

_____

[3] Because the matter is resolved on statute of limitations grounds, the Court need not concern itself with the differences between East Bay Management, Inc., and East Bay Management, Ltd., whether the "Inc." version actually exists, or what Karkus's involvement with East Bay was.

[4] It is also worth noting that Exhibit A to Plaintiff's complaint, which he cites as evidence of his initial purchase of the 36,496 shares in December 1996, actually bears a date that is clearly in 1997, possibly August 14 and potentially indicating Plaintiff in fact still had the shares at issue.

*Karkus*, 09-1725, *The Quigley Corporation v. Karkus*, 09-2438, and *Karkus v. The Quigley Corporation*, 09-2239; two cases in the Court of Common Pleas of Bucks County, *ProPhase Labs, Inc. v. Quigley*, No. 2010-08227, and *ProPhase Labs, Inc. v. Quigley*, No. 2011-09815; and a case in the Court of Common Pleas of Philadelphia County, *Quigley v. Karkus*, December Term 2011, No. 000409.

Plaintiff initiated the present case by filing a complaint in the Court of Common Pleas of Bucks County on June 10, 2013. Defendant Karkus removed to this court on July 10, 2013. Defendant Karkus filed a motion to dismiss, and on January 7, 2014, the Court held oral argument on that motion as well as the motion to dismiss in related case *Estate of Josephine Quigley v. East Bay Management, Inc.*, 13-5547.[5] The motion in this case will be granted in its entirety, with prejudice, for reasons discussed below.[6]

Discussion

Plaintiff's complaint contains causes of action for fraud, conversion, unjust enrichment, and civil conspiracy; the time periods in which these claims must be brought are two years, two years, four years, and two years, respectively. *See* 42 Pa. C.S.A. §§ 5524 & 5525. Statutes of limitations such as these serve the purposes of finality and repose. *See Estate of Miller ex rel. Miller v. Hudson*, 528 F. App'x 238, 240 (3d Cir. 2013); *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 459 (3d Cir. 2010). "Generally, a

---

[5] The motion to dismiss in 13-5547 is granted in part and denied in part as discussed in a separate opinion and order.

[6] Attorneys for Karkus note they do not represent East Bay Management, Inc., and in fact dispute its existence. The record, including the state court docket, indicates that East Bay Management, Inc., has not appeared in this case or been served. Similarly, the John Doe Defendant has not been identified. Because it is clear that the statute of limitations defense raised by Karkus would equally preclude any claims against East Bay or any John Doe, the Court will, on its own initiative, dismiss the complaint with respect to them as well. *See Jefferies v. D.C.*, 916 F. Supp. 2d 42, 46-47 (D.D.C. 2013); *see also Berg v. Obama*, 574 F. Supp. 509, 515 n.6 (E.D. Pa. 2008), *aff'd*, 586 F.3d 234 (3d Cir. 2009); *Coggins v. Carpenter*, 468 F. Supp. 270, 279 (E.D. Pa. 1979).

statute of limitations period begins to run when a cause of action accrues; i.e., when an injury is inflicted and the corresponding right to institute a suit for damages arises." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011).

Nevertheless, the running of limitations periods may be tolled by the discovery rule "when 'the injured party is unable, despite the exercise of due diligence, to know of his injury or its cause.'" *Perelman v. Perelman*, 545 F. App'x 142, 149 (3d Cir. 2013) (quoting *Knopick v. Connelly*, 639 F.3d 600, 609 (3d Cir. 2011)). "To invoke the rule, a plaintiff must exercise reasonable diligence in discovering his injury." *Kach v. Hose*, 589 F.3d 626, 642 (3d Cir. 2009). A plaintiff must have "exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.* at 642 (quoting *Wilson v. El–Daief*, 964 A.2d 354, 362 (Pa. 2009)).

The reasonable diligence standard may incorporate specific circumstances and ask what reasonable diligence would comprise under those circumstances, but it is an objective rather than subjective test. *See Perelman*, 545 F. App'x at 149 ("Though the reasonable diligence test accounts for the different capacities of different plaintiffs, the test is nonetheless an objective one."); *D.D. v. Idant Labs.*, 374 F. App'x 319, 322 (3d Cir. 2010) ("Reasonable diligence is an objective test, but it is also 'sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question.'" (quoting *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005))).

The only other seriously contended basis for tolling the statutes in this case is the fact that the underlying substance of the claims involves fraud, but that does not

fundamentally change the reasonable diligence analysis. While Plaintiff cites a case stating that the period will be tolled "without more" when the cause of action sounds in fraud, that simply means the more active cover-up sometimes described with respect to equitable tolling under fraudulent concealment is not necessary; the requirement of diligence on a plaintiff's part still applies. *See Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 144 (3d Cir. 1997) ("Regardless of the grounds for seeking to toll the statute, the plaintiff is expected to exercise reasonable diligence in attempting to ascertain the cause of any injury."); *Wise v. Mortgage Lenders Network USA, Inc.*, 420 F. Supp. 2d 389, 395 (E.D. Pa. 2006) (assessing, in the case Plaintiff cites, whether the plaintiffs had "alleged facts that are sufficient to show they did not, and could not, have discovered the fraud and breach until" a later time). Reasonable diligence is also required of plaintiffs seeking equitable tolling because of fraudulent concealment. *See Beauty Time, Inc.*, 118 F.3d at 144. Reasonable diligence also remains a separate element for tolling even when there is a so-called "self-concealing conspiracy," which only makes it unnecessary to show affirmative acts of concealment. *See Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 274-75 (E.D. Pa. 1986).

In this case, Plaintiff's claim for tolling is based on his allegation that he was unaware of the stock split.[7] He argues that he had no reason to know of the alleged fraudulent transfer because he did not know he had any such shares to transfer. The exercise of even minimal attention to his affairs would have clearly made Plaintiff aware of the stock split and the fact that he had extra shares in his account. Indeed, it is almost impossible to believe Plaintiff was not truly aware that the company that bears his name had split its stock shares. He clearly would have been aware had he exercised any kind of

---

[7] *See* Complaint (Notice of Removal (Docket #1), Exhibit I) ¶¶ 12, 17, and 25.

reasonable diligence. Plaintiff's involvement with the company, including his own brother's position at its head, and the multiple public notices would have made any reasonably diligent person aware of the stock split. Even if Plaintiff were a mere investor without deep connections to the company, the "attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests" should have led him to keep abreast of the numerous public notices regarding the specifically stock-related activity of a company in which he owned an interest of at least hundreds of thousands of dollars. *Kach*, 589 F.3d at 642. Beyond that, even if it were not a failure of reasonable diligence to have missed all announcements about the stock split, a reasonable investor would keep track of his accounts well enough to notice the influx of 36,496 additional shares into his account; by Plaintiff's own allegations and documents, the shares were definitely in his account before he believed he cleaned out the account and for almost seven months before the transfer to East Bay. Finally, even if it were somehow reasonable to miss the stock split and the presence of double shares in the account, a sufficiently diligent person would have noticed an unauthorized transfer of hundreds of thousands of dollars of stock. That Plaintiff missed all of these facts and failed to perform any review of his accounts that would have revealed these events for fourteen years must prevent any reasonable finder of fact from concluding that Plaintiff exercised the diligence required to toll the limitations periods.

The death of Plaintiff's wife, although tragic as any death is, does not significantly affect our conclusion. Such an occurrence would understandably cause distraction and upheaval in a person's life. It is not necessary, however, to attempt to determine if that tragedy could justify some delay in uncovering the cause of action,

because no reasonable finder of fact could allow the length of delay that occurred in this case.

Finally, this Court is not hesitant to enforce the statutory limitations periods in a case that strongly implicates their underlying rationale. This case was filed approximately sixteen years after the events at issue—eight times the statutory period for most of the claims. Given the extreme lapse of time and the existence of multiple lawsuits between these parties in multiple courts over many years, the importance of finality and repose could hardly be more stark. The Court will grant the motion to dismiss.